United States District Court
Southern District of Texas
**ENTERED**
February 09, 2016
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

GALVESTON DIVISION

| | | |
|---|---|---|
| SCANDINAVIAN BUNKERING, A.S. | § | |
| | § | |
| V. | § | CIVIL ACTION NO. G-13-269 |
| | § | |
| NORFIELD SHIPPING, A.S. | § | |

## REPORT AND RECOMMENDATION

Before the Court, by referral from the Honorable George C. Hanks, Jr., United States District Judge, is the Motion for Partial Summary Judgment of Plaintiff, Scandinavian Bunkering, A.S. (Scandinavian). This dispositive motion, like its two predecessors, has generated hundreds of pages of briefing and exhibits which have been reviewed and considered. The Court now submits this Report and Recommendation to Judge Hanks.

Perhaps a short synopsis of the history of this case is order. In August and September 2012, Scandinavian, a Norwegian company, provided bunkers to two ships owned by Defendant Norfield Shipping AS (Norfield), also a Norwegian company, the M/V OCEAN PEARL and the M/V MALENE OSTERVOLD. At the time of the bunker deliveries the vessels were bareboat chartered to Reservoir Exploration Technology, ASA (RXT), another Norwegian company. RXT had ordered the fuel and accepted the delivery in Killybegs, Ireland. According to Scandinavian, RXT never paid for the bunkers and it ultimately filed for bankruptcy in Norway.

This litigation between Scandinavian and Norfield began when Scandinavian had a different vessel owned by Norfield, the M/V BERGEN SURVEYOR, attached pursuant to Rule B when the ship was in Galveston.  Norfield's Motion to Vacate alleging, *inter alia*, that no contract existed between it and Scandinavian and that the bunkers had been substantially paid for was granted after the Court found that no contract existed between the two.  Aside from the Rule B attachment, Scandinavian also had the OCEAN PEARL and the MALENE OSTERVOLD arrested in Galveston pursuant to Rule C by alleging that the provision of the bunkers to those ships created enforceable maritime liens against them based upon an unusual unilateral forum selection clause related to the deliveries.  Norfield once again sought vacatur, but the Court ultimately ruled that under a Fifth Circuit decision there was a basis for the assertion of liens against the vessels.

Scandinavian has now moved for a partial summary judgment enforcing those liens, *in rem*, against the vessels in the amount of about $1,137,000.000.

The law of summary judgment is well known to the District Court and the summary judgment standards most relevant here are well established:  the Court must accept the nonmovant's evidence as true; it must draw all reasonable inferences from that evidence in the light most favorable to nonmovant; and it must avoid making credibility determinations.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986); <u>Dibidale of La., Inc. v. American Bank & Trust Co.</u>, 916 F.2d 300, 307-08 (5th Cir. 1990) ("Credibility assessments are not fit grist for the summary judgment mill.").  One other

2

aspect of summary judgment jurisprudence bears noting: despite the mandatory language of Rule 56(c), under special circumstances the District Court has discretion to deny summary judgment where there is reason to believe the better course is to proceed to a full trial. Anderson, 477 at 255. Applying these standards this Court has concluded that Scandinavian's motion should be denied.

The Court painstakingly examined, as best it could, Scandinavian's purported bookkeeping and determined that, if believed, it appears to reflect the alleged indebtedness. Nevertheless, the Court has been unable to conclude that Scandinavian's position is sufficiently trustworthy on the present record of this case. Scandinavian's factual allegations during the pendency of this litigation have taken suspicious turns in direct reaction to Norfield's numerous revealing responses to those allegations.

Originally, Scandinavian's verified petition for a Rule B attachment failed to even disclose the existence of RXT, the company it contracted with for the fuel. Instead, Scandinavian premised each of its claims on its alleged "sale and delivery of the marine fuels **to Norfield**" and the vessels. Norfield sought vacatur of the attachment by, *inter alia*, challenging Scandinavian's proof of any contract between them and provided evidence that Scandinavian's contractual relationship was with RXT. Norfield also produced evidence that most of the alleged debt had already been paid by RXT. The Court ultimately found

that no contract between Scandinavian and Norfield, if any, could support a Rule B attachment and it was vacated.[1]  See Doc. Nos. 37 and 55.

During the pendency of Norfield's motion to vacate the Rule B attachment Scandinavian filed another verified complaint and had the OCEAN PEARL arrested pursuant to Rule C.  Following the vacatur of the attachment, Scandinavian filed yet another verified complaint and had the MALENE OSTERVOLD arrested.  In each of those cases, Scandinavian relied upon the alleged existence of a maritime lien against the vessels for the provision of "necessaries."  Those cases were consolidated with this one.  Norfield moved to vacate the arrests, but its motion was denied under the Fifth Circuit decision in Liverpool &London Steamship Protection and Indemnity Association v. QUEEN OF LEMAN MV, 296 F.3d 350 (5th Cir. 2002), also see, Doc. Nos. 95 and 99.

The status of the debt, if any, was not decided when the attachment was vacated, but in responsive briefing to the Motion to Vacate the attachment, Scandinavian countered Norfield's allegations of payment with a declaration from its managing director, Kennet Bollerude, that shortly before the deliveries of the bunkers in suit Scandinavian and RXT reached a verbal "debt limitation agreement."  According to Scandinavian, because RXT owed Scandinavian in excess of $2 million dollars of unpaid invoices, this agreement provided that RXT would have to pay cash in advance of any future bunker deliveries.

---

[1] The issue of whether Scandinavian had acted in bad faith and thereby exposed itself to the imposition to attorney's fees has not yet been determined.

The agreement was in effect when the bunkers in suit were delivered and Scandinavian received prepayment of the amount of the costs of that fuel.  However, Bollerude further averred that, in accordance with the contractual terms and conditions applicable to the deliveries in suit, the required advance cash payments it received would be applied to outstanding and unpaid invoices.  Under this approach. Scandinavian argues that since the fuel deliveries in suit had not actually been paid for, the maritime liens were valid and supported the Rule C arrests.  To justify this seemingly inconsistent treatment of RXT's payments, Scandinavian produced copies of the relevant invoices that provided for "payment terms: 30 days from date of delivery."  Following receipt of this information, Norfield tracked down the former chief financial officer of RXT, Tomas Bratterud, and obtained his sworn declaration.  Bratterud's declaration provided testimony that at the relevant times RXT was paying cash in advance for deliveries and supported that testimony with exhibits including emails and wire-transfers of prepayment for the deliveries in suit.

Following receipt of these revelations, Scandinavian produced a sworn declaration from one of its bunker traders, Ole Morton Rismyhr.  According to Rismyhr the invoices Scandinavian had previously produced indicating the 30-day terms of payment were only the initial drafts of the invoices and that they were accidently provided by him for use in this case.  Now Rismyhr averred that four of the five "actual bunker" invoices "differed from the preliminary draft in only one respect: Under the actual bunker (invoices) . . . the

terms of payment were 'CIA (cash in advance) against old invoices' whereas the drafts indicated payment terms of '30 days from the date of delivery'."[2]

Bratterud, however, also provided evidence that even if Scandinavian applied the advance cash payments "against old invoices" RXT paid Scandinavian over $4 million dollars after the last of the five deliveries in suit. Norfield, therefore, argues that Scandinavian has received more than enough money to have paid those invoices long before this litigation was commenced. Scandinavian, in response, offers its third option. It argues that under maritime common law it was allowed to apply the pre-delivery cash payments in any way it saw fit unless RXT directed otherwise. Cf. Compagnia Martima La Impresa S.A. v. Pickerd, 320 F.2d 829, 833 (5th Cir. 1963). This allowed Scandinavian to opt to apply the payments to RXT's "unsecured" invoices while preserving the claims secured by the alleged liens for the deliveries in suit. But, as Norfield points out, RXT's payments were governed by the contractual language requiring they be applied against the oldest invoices first and "thereafter chronologically to the most recent sum."

This Court simply finds Scandinavian's evolving evidence to be too unreliable to merit summary judgment. But that having been said, this Court expresses no opinion on whether Scandinavian might prevail at a full trial. To date, this case has proceeded

---

[2] The Court notes that even if Rismyhr's statements are found to be true, one of the deliveries to the MALENE OSTERVOLD in the amount of $105,000.00 appears to have been unconditionally paid for in advance.

through motions and briefing. Any "testimony" has been by sworn declarations of individuals not subjected to contemporaneous cross-examination and exhibits not contemporaneously challenged. This Court's only present conclusion is that genuine issues of material fact exist at this time which preclude the entry of summary judgment. Moreover, this Court would have serious doubts as to the wisdom of terminating this case before a full trial or, at the very least, full and fair discovery.

It is, therefore, the **RECOMMENDATION** of this Court that the Motion for Partial Summary Judgment (Instrument no. 73) of Plaintiff, Scandinavian Bunkering, A.S. be **DENIED**.

The Clerk **SHALL** send a copy of this Report and Recommendation to the Parties who **SHALL** have until **February 24, 2016**, to file objections pursuant to 28 U.S.C. §636(b)(1)(C). <u>The Objections **SHALL** be electronically filed and/or mailed to the Clerk's Office at P.O. Drawer 2300, Galveston, Texas 77553</u>. Failure to file written objections within the prescribed time **SHALL** bar any Party from attacking on appeal the factual findings and legal conclusions accepted by the District Judge, except upon grounds of plain error.

**DONE** at Galveston, Texas, this _____9th_____ day of February, 2016.

_____
John R. Froeschner
United States Magistrate Judge